# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

---------------------------------------------

BANGOR SAVINGS BANK,

    Plaintiff,

v.

DARLING CONSULTING GROUP,

    Defendant.

---------------------------------------------

)
)
)
)
)
)
)
)
)
)
)

Case No. _____

## COMPLAINT

COMES NOW Bangor Savings Bank ("Bangor" or "Plaintiff"), by counsel, and for its Complaint against Defendant Darling Consulting Group ("DCG" or "Defendant"), alleges as follows:

## INTRODUCTION

1.    Banks like Bangor that hold billions of dollars in assets and liabilities face multiple financial risks to the bank's long-term health and stability. In response, banks like Bangor develop and implement detailed asset-liability management ("ALM") policies to stabilize their balance sheets and help manage interest rate and other risks. Successful ALM policies act as compasses that allow banks to weather financial storms.

2.    Because a successful ALM policy is an essential ingredient of a bank's financial stability, banks like Bangor routinely seek consulting services to implement their ALM policies, especially when such policies require complex modeling to understand the level of risk posed by a bank's often-varied assets and liabilities. ALM models, when accurate, can help a bank determine when to take action to manage interest rate risk.

-1-

3.      DCG is a professional consulting group that specializes in providing consulting services to banks, including services related to ALM strategy and modeling.

4.      DCG contracted with Bangor for almost 25 years to provide ALM advisory services. To that end, DCG managed Bangor's ALM model (the "ALM Model"). Among other responsibilities, DCG analyzed the extent to which Bangor was exposed to interest rate risk, i.e., the risk of financial losses arising from changing interest rates that may apply to various assets and liabilities on Bangor's balance sheet.

5.      In 2019, the parties agreed to adjust the "repricing dates" of certain commercial loans in the ALM Model. Bangor needed a specific bundle of commercial adjustable-rate loans (the "In-Scope Commercial Loans") that were subject to "back-to-back interest rate swaps" to be repriced, and informed DCG of this. Back-to-back interest rate swaps typically involve a bank (here, Bangor) issuing an adjustable interest loan to a commercial customer, and then entering into an interest rate swap agreement with such customer effectively converting to a fixed-interest loan. Finally, the bank immediately enters into a second adjustable interest rate swap with a third-party dealer. The net effect of these agreements is that the customer pays a fixed-rate and Bangor receives a variable interest rate on the commercial loans.

6.      Because the In-Scope Commercial Loans were adjustable-rate loans and the interest rates for those loans repriced monthly, the ALM Model needed to reflect that structure of payments. Upon information and belief, DCG applied that date change to the ALM Model via an electronic script that DCG created, to only the In-Scope Commercial Loans for the following two years.

7.      In Fall 2020, a new DCG analyst was assigned to the Bangor ALM Model, and in May 2021, he inquired about the repricing dates on some of Bangor's variable rate commercial

loans. After further discussion, Bangor instructed the analyst to continue using the previously created DCG script to adjust the repricing dates for the In-Scope Commercial loans to account for their monthly repricing nature. Bangor specified that it wanted the adjustment to apply, as before, to the In-Scope Commercial loans. DCG never stated or implied to Bangor that DCG could not or would not limit the Agreed Script only to the In-Scope Commercial Loans.

8.     Despite that clear instruction, DCG inappropriately applied the modified script that adjusted the repricing dates to a significantly broader set of loans than the In-Scope Commercial Loans. DCG applied this change without Bangor's knowledge or approval. Inappropriately applying the script to loans to which they should not have been applied caused the ALM Model to produce results indicating that Bangor's balance sheet was significantly less liability sensitive than it actually was. As a result, Bangor was unable to take timely action to protect itself from rising interest rates.

9.     Bangor noticed discrepancies between the net interest income predicted by DCG's ALM Model and the amount of actual interest income Bangor was receiving. The numbers did not add up. When Bangor inquired about inaccuracies in the output of the ALM Model, DCG neglected to verify that the repricing methodology they had applied to the loan data was correct.

10.     Because of DCG's errors, Bangor's ALM Model significantly understated the impact of rising interest rates on Bangor's net interest income. If the ALM Model had properly indicated that interest rate risk was well above established thresholds, Bangor would have taken corrective action to mitigate the potential loss of net interest income from rising interest rates. Instead, the ALM Model indicated that Bangor was within policy guidelines and that Bangor did not need to take any action to proactively manage its interest rate risk. Because Bangor's ALM policies require Bangor to follow strict protocol in managing such interest rate risk and DCG's

ALM Model indicated that Bangor was within policy guidelines, Bangor did not take steps to appropriately manage its actual interest rate exposure or take other action when mitigation was necessary. Accordingly, Bangor's net interest income was approximately $14,607,000 lower than it would have been had the ALM Model not been corrupted by DCG's mismanagement of the script.

11.     By duty and by contract, DCG was required to make any necessary changes to the repricing dates to provide Bangor with a reliable ALM Model. Not only did DCG fail to consistently correct that data, DCG inexplicably applied its "temporary solution" to Bangor's commercial and consumer loans that were not In-Scope Commercial Loans, without Bangor's knowledge and without ever informing Bangor that DCG could not do what Bangor had requested. DCG was not just "following orders" by running the ALM Model – DCG took disastrous steps, brushed off Bangor's questions and concerns regarding the accuracy of the output of the ALM Model and then stood by the results in the face of clear evidence that its model was not accurately predicting interest rate risk exposure. DCG's carelessness injured Bangor and is actionable at law and in equity.

## **PARTIES**

12.     Plaintiff Bangor Savings Bank is a state-chartered bank that is organized under the laws of Maine. Plaintiff's principal place of business is located at 24 Hamlin Way, Bangor, Maine, 04401.

13.     Defendant Darling Consulting Group ("DCG") is a risk management consulting group organized under the laws of Massachusetts. Defendant's principal place of business is located at 260 Merrimac Street, Newburyport, Massachusetts, 01950.

## JURISDICTION

14.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest, cost, and attorney's fees, and there is complete diversity between the parties. Bangor, which is incorporated in Maine and has its principal place of business in Maine, is a citizen of Maine for diversity purposes. DCG is a citizen of Massachusetts, as it is both organized under the laws of Massachusetts and has its principal place of business in Massachusetts.

15.     This Court has personal jurisdiction over DCG because DCG's conduct satisfies Maine statutory requirements for exercising personal jurisdiction over nonresidents.

16.     DCG maintained a contractual relationship with Bangor from 2000 to October 2024, when Bangor contracted with another party to provide risk management services. DCG's breach of the parties' contract injured Bangor, a Maine citizen for jurisdictional purposes.

17.     In addition, DCG purposefully availed itself of Maine's laws when it created models, reports, and regularly sent communications to Bangor in Maine. Given the parties' almost-25-year contractual relationship involving the provision of consulting services in Maine for use by a Maine bank, it is reasonable for DCG to expect that Bangor's claims related to that longstanding contractual relationship would be litigated in Maine.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(a)(2) because the events giving rise to the claims in this case, including negotiating and signing the agreements for the provision of DCG's financial consulting services, substantially occurred in this District.

## BACKGROUND

### A.     Bangor and DCG's Business Relationship from 2000 to 2019.

19.     For almost 25 years, Bangor relied on DCG to run and maintain its ALM Model. Ex. 1, June 20, 2014 Ltr. Re: Retainer Arrangement, at 1 (the "2014 Engagement Letter"). The

ALM Model allows Bangor to monitor financial risks associated with any mismatches between the structure and composition of its assets and liabilities.

20.    Among other uses, the ALM Model acts as Bangor's compass to navigate interest rate risk, particularly if interest rates unexpectedly rise or fall. *Id.* Based on the model's report of the bank's risk position, Bangor takes steps to ensure that risks are well managed and kept within the tolerance ranges established by internal bank policies.

21.    Bangor began using DCG's modeling and financial consulting services around the year 2000. *Id.*

22.    Every three years, Bangor and DCG signed an updated series of agreements defining the scope of DCG's services and responsibilities to Bangor. In June 2014, DCG sent Bangor an engagement letter laying out a three-year retainer agreement and the scope of work to be conducted under that agreement. *Id.*

23.    The 2014 Engagement Letter explains DCG's responsibilities under the parties' agreement, including that DCG was required to meet quarterly with Bangor staff "to review the current balance sheet risk profile and develop a set of potential strategies for the ensuing quarter." *Id.* at 2. During those quarterly meetings, the parties discussed Bangor's "balance sheet risk posture," and "[r]eview[ed]" the Bank's exposure to changes in interest rates." *Id.* "Based upon [Bangor's] risk profile," DCG would recommend strategies "to reduce risk and/or take advantage of opportunities to increase income. Strategies will include the lending, investment and funding areas of the Bank, as well as derivative alternatives (e.g., interest rate caps/floors/ swaps), as appropriate." *Id.*

24.    DCG further promised to "build and maintain a detailed dynamic simulation model which will be utilized to analyze the Bank's current ALM [Asset Liability Management] position

for each quarterly review." *Id.* To that end, DCG would "work with [Bangor] personnel to help improve requisite information and key assumptions" of the model. *Id.* These "assumption calls" held between Bangor and DCG analysis are a "critically important component of this phase of the engagement" according to DCG. *Id.* That is because "[b]ased upon this modeling effort, [DCG] will also prepare the quarterly ALCO [Asset Liability Management Committee] reporting package," which would be discussed at the next quarterly meeting. *Id.* at 15.

25.     The 2014 Engagement Letter also lays out DCG's pay structure, which consists of an annualized retainer fee and reimbursement for specific expenses incurred by DCG. *Id.*

26.     The parties renewed their agreement in writing following the culmination of each three-year term. The most recent agreement was signed in 2023 and extends DCG's scope of work through May 2026. Ex. 2,  Apr. 21, 2023 Ltr. Re: Retainer Arrangement, at 1 (the "2023 Engagement Letter"). After Bangor discovered DCG's material breach of the parties' agreement described below, it ceased working with DCG and engaged another party to provide ALM Model services.

27.     The 2023 Engagement Letter lists an up-front fee of $375,000 for the three-year agreement ($120,000 for the first year, $125,000 for the second, and $130,000 for the third). *Id.*

28.     DCG's risk management services go beyond taking a client's data and blindly plugging it into an ALM model like Bangor's. DCG's services include undertaking a multi-step process to validate the utility of a client's data sources.

29.     DCG claims that its analysts produce their model to clients like Bangor only after discussing and resolving any issues with potentially problematic data provided by the client.

B.    **DCG's Modeling Error Begins in 2019.**

30.    Bangor first expressed concerns with the output of DCG's ALM model in 2019. Ex. 3, Emails Re: Loan Repricing Question, at 3 (Nov. 6, 2019 Email from E. Poulin to S. Paradis). The error involved the In-Scope Commercial Loans (i.e., certain commercial adjustable-rate back-to-back swapped loans) listed on Bangor's loan portfolio. Through these swapped loans, a borrower enters into a variable rate loan arrangement with bank. The bank then simultaneously enters into offsetting interest rate swaps with the borrower and a third-party dealer. As a result of these "back-to-back swaps," the bank receives a fixed rate from the borrower and swaps that fixed rate for a variable rate from the third-party dealer. The second swap with the dealer offsets the bank's exposure from the first swap with the borrower, thereby allowing the bank to manage its interest rate risk effectively.

31.    In the loan data compiled by Bangor and sent to DCG to populate the 2019 version of the ALM Model, the repricing dates of these In-Scope Commercial Loans was set to the maturity date of the loan because the bank's internal loan system reflected that the borrower was paying a fixed rate (as a result of the swap) for the term of the loan. Thus, in order to reflect that Bangor was actually receiving a variable interest rate due to the swap with a counterparty, DCG needed to adjust the repricing dates of the In-Scope Commercial Loans to reflect that they adjusted monthly.

32.    DCG understood that the data Bangor sent DCG regarding its In-Scope Commercial Loans needed to be updated to reflect the correct repricing date in developing an ALM model.

33.    In email conversations throughout the end of 2019 and into early 2020, DCG analysts routinely worked with Bangor staff to run an "Agreed Script" that would properly identify and account for the monthly repricing nature of the In-Scope Commercial Loans. Ex. 3, Emails Re: Loan Repricing Question (emails between DCG and Bangor staff applying the necessary

"logic" to adjust the repricing dates). The parties understood that the Agreed Script would only apply to the In-Scope Commercial Loans. DCG never stated or implied to Bangor that DCG could not or would not limit the Agreed Script only to the In-Scope Commercial Loans.

34.     In May 2021, DCG analyst James Parady (who had recently been assigned to work with Bangor) noticed that DCG's ALM model incorrectly reflected the maturity dates of the In-Scope Commercial Loans rather than the repricing dates of those loans. Ex. 4, May 7, 2021 Email from J. Parady to S. Paradis Re: Loan Data. This error meant that the Agreed Script, which should have changed the repricing date every month, was not being applied correctly. *Id.* Mr. Parady contacted Bangor about this problem. Bangor instructed Mr. Parady to apply the same fix to the ALM Model for the In-Scope Commercial Loans that DCG had applied in 2019 and 2020.

35.     However, rather than limiting its correction to the In-Scope Commercial Loans from 2019 and 2020, DCG erroneously (and without Bangor's knowledge or approval) applied the Agreed Script to a significantly *broader set* of loans than only the In-Scope Commercial Loans that Bangor requested. Bangor was never notified of the scope and scale of this change. DCG never stated or implied to Bangor that DCG could not or would not limit the Agreed Script only to the In-Scope Commercial Loans.

36.     Specifically, DCG applied the Agreed Script to *all* of Bangor's one-month adjustable-rate loans, including commercial and consumer loans that were not subject to back-to-back swaps. Ex. 5, Apr. 21, 2025 Hogan Lovells Demand Ltr., at 2. DCG did so without informing Bangor. This unauthorized change caused a significant overstatement of the repricing frequency for Bangor's loan portfolio.

37.     This script also led to a corresponding understatement of Bangor's earnings at risk ("EAR") exposure and the liability sensitivity of Bangor's balance sheet. *Id.* The erroneous

application of DCG's repricing fix significantly understated the impact of rising interest rates on Bangor's net interest income and caused the model to produce erroneous results indicating that Bangor's interest rate risk was within policy guidelines.

38.    The harm caused by DCG's significant errors was compounded by the fact that Bangor was unable to address the problem itself. Because DCG's ALM Model is proprietary, Bangor could not review the model to ensure that it was being properly applied. Instead, Bangor was at the mercy of DCG to ensure that the formulas in the model were correct.

39.    DCG's timing could not have been worse. In the aftermath of the COVID-19 pandemic, markets were roiled by dramatic changes in fiscal and economic policy that sent interest rates tumbling and then skyrocketing. DCG's model—if based on accurate information—would provide Bangor with confidence that it had hedged risk correctly and could survive an interest rate storm.

40.    Unfortunately, the systemic and egregious repricing error that DCG made from early 2021 to June 2024 resulted in an ALM model that significantly understated the impact of rising rates on Bangor's net interest income.

### C.    Bangor Asks DCG to Investigate Its Flawed Model and Results.

41.    During those three and a half years, Bangor routinely asked DCG questions about the ALM Model's accuracy, assumptions, and the underlying data. Ex. 5 at 2 (Hogan Lovells Demand Letter). In 2023, Bangor reached out to DCG analyst James Parady for an explanation of why its interest income came in lower than the ALM Model anticipated. *Id*. Mr. Parady merely repeated previous explanations for the variance drivers; he made no mention of the model script impact on repricing dates. *Id.*

42.     In September 2023, Bangor asked another DCG analyst, Brett Grady, for a second opinion on the ALM Model. *Id.* Mr. Grady repeated that the assumptions had been applied accurately and did not comment on the model script impact or inquire on the continued accuracy. *Id.*

43.     By January 2024, analysts at Bangor began to suspect that DCG made additional adjustments to the ALM Model without disclosing those changes to Bangor. *Id*. at 3. When Will Perkins of Bangor reached out to DCG with his suspicions and inquired as to whether the variance could have been caused by changes to Bangor's supplied prepayment assumptions, DCG assured him that no adjustments had been made to the loan prepayment assumptions. *Id*. DCG took no further action to determine the root cause of the variance between actual and model predicted interest income.

44.     In March and June 2024, Bangor reduced projected interest rates for new volume and loan repricing rates to ensure the bank was not overstating production yield levels. Prepayment speeds for loan categories were also reviewed and adjusted, as needed, to ensure assumptions were not being overstated. However, the ALM Model produced no significant changes. *Id.* The resulting lack of change caused Bangor to suspect that the ALM Model was not repricing correctly.

45.     In August 2024, Bangor asked Mr. Grady at DCG for help determining why the ALM Model's projections for interest income differed from the interest income Bangor received. *Id.* at 3. On August 21, 2024, Mr. Grady explained that he found an old "note" written by Mr. Parady that directed analysts to manually "scrub" the data to fix the repricing model.

46.     Upon information and belief, DCG analysts had been incorrectly adjusting repricing dates by applying the "scrub" to *all of Bangor's one-month adjusting variable rate loans* since May of 2021. Without ever verifying or communicating with Bangor about the

appropriateness of these actions, DCG analysts implemented a systemic change to Bangor's loan data, when Bangor had only requested an adjustment to the In-Scope Commercial Loans.

47.    In September 2024, after identifying the issue, Bangor requested that DCG rerun the model without altering the repricing dates, except for the In-Scope Commercial Loans. This model run would inform Bangor of its expected interest income, absent the flaws in the older version of the ALM Model.

48.    By running the new model, Bangor confirmed the harm that it suffered as a result of DCG's repricing errors. If DCG's model had correctly reflected Bangor's loan data, the bank would have hedged its interest risk much earlier, according to its established risk guidelines, and avoided a reduction in net interest income of $14,607,000. Ex. 6, Bangor Savings Bank Asset/Liability Management Policy, at 50 (Bangor Asset/Liability Management Policy). In other words, DCG's application of the "scrub" to Bangor's adjustable-rate loans cost Bangor nearly $15 million.

**D.    <u>DCG Admits Error and Refuses to Stand By Its Work Product</u>**

49.    Bangor held a video conference with DCG on October 30, 2024, to share its findings and the damage that DCG's modeling failures caused. Ex. 5 at 1 (Hogan Lovells Demand Letter). In the following three months, DCG made no attempt to reach out to Bangor to address the issues that Bangor raised with DCG's ALM model. *Id.*

50.    On January 17, 2025, Bangor sent a letter to DCG seeking a mutually agreeable resolution without resorting to litigation. *Id.* Bangor requested a substantive proposal from DCG to resolve the matter.

51.    On February 13, 2025, DCG responded with a letter outlining the "opportunities" that Bangor had to "readily" uncover the errors in DCG's model. Ex. 7, Feb. 13, 2025 DCG Resp.,

at 2–3. Tellingly, DCG's response did not explain why it did not take advantage of those same opportunities to disclose its errors to Bangor. Nor did it address how or why the Agreed Script was applied to a larger-than-agreed-upon portion of Bangor's commercial and consumer loans.

52.     DCG attempted to argue that it was not responsible for the errors it made, pointing to a disclaimer in each of its reports that it "do[es] not guarantee . . . accuracy." *Id.* at 3. Bangor was dismayed to learn that a trusted partner for almost 25 years did not stand by the quality of its analysis, particularly in a way that contradicted its own handbook on control standards.

53.     Following DCG's attempt to disclaim the accuracy of its models, Bangor had little choice but to engage outside legal counsel to resolve the matter. On April 21, 2025, legal counsel on behalf of Bangor sent a letter to DCG outlining the above-described chain of events and Bangor's estimate of its damages. Ex. 5 at 6 (Hogan Lovells Demand Letter). In the letter, Bangor demanded an explanation for DCG's modeling errors and asked DCG to take steps to remedy the situation.

54.     On May 2, 2025, DCG responded with a 20-page letter accusing Bangor of "blind[ly] accept[ing]" DCG's "temporary solution" back in 2019. Ex. 8, May 2, 2025 DCG Resp. at 16. Again, at no point in its letter did DCG explain how or why its "temporary solution" was applied to nearly all of Bangor's commercial and consumer interest loans, other than vaguely asserting that the loans were "comingled." *Id.* at 4.

55.     DCG's response notably failed to mention its conduct in 2022 and 2023, when Bangor flagged its concerns about the ALM Model but was consistently reassured that the model produced accurate results. During that window, Bangor noticed the gap between the net interest income predicted by DCG's model and the real-world interest income Bangor was receiving. Once Bangor suspected that the results were inaccurate, it performed the required due diligence and

confronted DCG about its concerns. DCG then spent two years denying anything was wrong with the model or its results. It was DCG who failed to exercise reasonable care to prevent millions of dollars in interest rate risk costs.

### COUNT I
### (Breach of Contract – Express and Implied)

56.    Bangor restates and incorporates by reference each of the allegations set forth in paragraphs 1-55 above as if fully set forth herein.

57.    Bangor and DCG's retainer agreements, as memorialized in their engagement letters, are valid and binding contracts, supported by consideration, to which Bangor and DCG are parties. As part of their agreement, DCG agreed to, among other things, "[r]eview [Bangor's] exposure to changes in interest rates" and recommend strategies "to reduce risk and/or take advantage of opportunities to increase income." Ex. 1 at 2 (2014 Engagement Letter). DCG further agreed to "work with [Bangor] personnel to help improve requisite information and key assumptions" underlying the ALM model. *Id.* This responsibility included "[b]ased upon this modeling effort, [preparing] the quarterly ALCO reporting package." *Id.* at 3.

58.    All conditions precedent to the maintenance of this action have been performed or have occurred.

59.    DCG thus breached the express language of the Agreement when it mismanaged the ALM Model by applying the repricing date to all of Bangor's one-month adjusting variable rate commercial and consumer loans, rather than repricing only the In-Scope Commercial Loans, and by failing to inform Bangor of the same.

60.    In addition, DCG breached an implied term of the parties' contract by failing to identify and fix the incorrect treatment of commercial and consumer loans that were not in-scope. DCG promised to research questions that arise in connection with Bangor's ALM model and to

review any such questions with Bangor and resolve them in order to ensure the validity of the ALM Model. Complying with these promises is indispensable to DCG's commitment to provide risk-management services to Bangor.

61.    DCG breached its implied obligations to Bangor established by the Processes and Controls Handbook because it did not ensure the validity of Bangor's ALM Model when it repeatedly applied the Agreed Script to loans other than In-Scope Commercial Loans and failed to inform Bangor of the same. Despite repeated inquiries from Bangor over several years regarding the accuracy of the ALM Model, DCG also failed to properly account for the problematic data resulting from its erroneous application of the Agreed Script to out-of-scope loans, or to remedy the erroneous application of the Agreed Script, until Bangor forced DCG to fully investigate the issue in 2024.

62.    As a result of DCG's material breach, Bangor suffered at least $14,607,000 in damages. This amount reflects the losses that would have been avoided if Bangor had been aware of its EAR exposure and the liability sensitivity of its balance sheet sooner, which it would have known if not for DCG's erroneous application of the repricing change to Bangor's loans.

## COUNT II
### (Negligence)

63.    Bangor restates and incorporates by reference each of the allegations set forth in paragraphs 1 -55 above as if fully set forth herein.

64.    By virtue of the parties' contract and their fiduciary relationship, DCG owed Bangor a duty of care when it agreed to manage the ALM Model.

65.    DCG breached that duty when it failed to identify and fix the incorrect treatment of commercial and consumer loans that were not In-Scope Commercial Loans and to inform Bangor

of the same, even after the Bangor raised questions with DCG on multiple occasions regarding the application of the Agreed Script to those out-of-scope loans.

66.     As a result of DCG's negligence, Bangor suffered approximately $14,607,000 in damages.

## COUNT III
### (Breach of Fiduciary Duty)

67.     Bangor restates and incorporates by reference each of the allegations set forth in paragraphs 1 -55 above as if fully set forth herein.

68.     DCG owed a fiduciary duty to Bangor. Bangor placed trust and confidence in DCG to provide specialized services regarding, among other things, interest rate calculations for certain loans when managing Bangor's ALM Model.

69.     In addition, there was a great disparity of position and influence between the parties with respect to the ALM Model, because DCG exercises complete control over the model, which is proprietary to DCG. Owing to the propriety of DCG's modeling, Bangor did not have access or visibility to the details and precise workings of the ALM Model. Accordingly, Bangor did not have the ability to independently determine or verify whether the Agreed Script was being applied to the correct loans.

70.     As a result of DCG's breach, Bangor suffered approximately $14,607,000 in damages.

## COUNT IV
### (Negligent Misrepresentation)

71.     Bangor restates and incorporates by reference each of the allegations set forth in paragraphs 1 -55 above as if fully set forth herein.

72.     In the course of its business, profession, or employment, DCG supplied false information to Bangor for the guidance of Bangor in its business transactions.

73.     Bangor reached out to DCG on at least three occasions—in June 2023, December 2023, and January 2024—to ask why its net interest income was significantly lower than the ALM Model's prediction. In response to these inquiries, DCG personnel repeatedly failed to mention its improper application of the Applied Script to out-of-scope loans, and instead falsely confirmed that all pricing adjustments were correct.

74.     DCG failed to exercise reasonable care or competence in obtaining or communicating the information that it falsely provided to Bangor. DCG's statements about its errors in applying the Applied Script were at least negligent.

75.     Bangor justifiably relied on the false information supplied to it by DCG.

76.     As a direct result of DCG's misrepresentations, Bangor has suffered no less than $14,607,000 in damages.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Bangor prays that this Court:

a)     Enter judgment in favor of Bangor;

b)     Award Bangor:

    i)     Compensatory damages in an amount to be determined, and in any event no less than $14,607,000, plus any fees paid to DCG during the relevant period; and

    ii)     Bangor's attorneys' fees and costs incurred through resolution of this matter; and

c)     Grant such other and further relief as the Court deems just and proper.

Dated: December 30, 2025

Respectfully submitted,


By: /s/ Daniel L. Rosenthal
Daniel L. Rosenthal, Bar #8618
MARCUS CLEGG
16 Middle Street, Unit 501
Portland, ME 04101
Tel: 207-828-8000
dlr@marcusclegg.com

Jon M. Talotta
HOGAN LOVELLS US LLP
8350 Broad Street, Seventeenth Floor
Tysons, VA 22102
Tel: 703-610-6156
Fax: 703-610-6200
jon.talotta@hoganlovells.com

*Counsel for Plaintiff Bangor Savings Bank*