UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

BANGOR SAVINGS BANK,                )
                                    )
          Plaintiff                 )
                                    )
     v.                             )          1:25-cv-00652-JCN
                                    )
DARLING CONSULTING GROUP,           )
                                    )
          Defendant                 )

**ORDER ON MOTION TO COMPEL ARBITRATION**

Plaintiff Bangor Savings Bank (Bangor Savings) commenced this action against

Defendant Darling Consulting Group (Darling) seeking damages for breach of contract,

negligence, breach of fiduciary duty, and negligent misrepresentation.  (Compl., ECF No.

1.)  Darling moves the Court for an order compelling arbitration of the dispute and staying

or dismissing this action under 9 U.S.C. §§ 3-4.  (Mot. to Compel, ECF No. 8.)  Bangor

Savings opposes the motion.  (Opp. to Mot. to Compel, ECF No. 18.)

Following a review of the record, and after consideration of the parties' written and

oral arguments, the Court denies the motion to compel arbitration.

**BACKGROUND**[1]

In the complaint and in its opposition to the motion to compel, Bangor Savings

describes the pertinent background as follows: Beginning in 2000, and for nearly 25 years

---

[1] The record "for purposes of resolving a motion to compel arbitration generally includes the complaint and the record materials submitted in support of or opposition to the motion." *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 171 n.1 (1st Cir. 2021).

thereafter, Bangor Savings contracted with Darling, a risk management consulting group, to provide modeling and financial consulting services. (Compl. ¶¶ 13, 19, 21.) During this period, Darling provided services to implement Bangor Savings' asset-liability management (ALM) policies. (*Id.* ¶¶ 4, 19.) Darling managed Bangor Savings' ALM model, analyzing the extent to which Bangor Savings was exposed to interest rate risk. (*Id.* ¶ 4.)[2] Bangor Savings also separately contracted with Darling to provide other kinds of consulting services. (Opp. to Mot. to Compel at 2.)

Every three years, Bangor Savings and Darling signed an agreement describing the scope of Darling's ALM services. (Compl. ¶ 22.) In 2014, Darling sent Bangor Savings an engagement letter providing for the renewal of the parties' three-year retainer agreement along with an attached Summary of Engagement Scope describing the services to be provided under the engagement, which services included building and maintaining a model that would be used to analyze Bangor Savings' ALM position. (*Id.* ¶¶ 22-24; Compl. Ex. 1, ECF No. 1-1.) Thereafter, the parties renewed their agreement in writing following the conclusion of each three-year term. (Compl. ¶ 26.) Bangor Savings submits that the engagement letters, which do not include an arbitration clause, govern the dispute in this case. (Opp. to Mot. to Compel at 2-5.)

According to Bangor Savings, in 2019, the parties agreed to adjust the "repricing dates" of certain commercial loans in the ALM model. (Compl. ¶ 5.) Bangor Savings told

---

[2] Bangor Savings describes the ALM model as a program permitting it to "monitor financial risks associated with any mismatches between the structure and composition of its assets and liabilities." (Compl. ¶ 19.)

Darling that it needed a specific bundle of commercial adjustable-rate loans that were subject to "back-to-back interest rate swaps" to be repriced so that the ALM model accounted for the structure of payments associated with the loans.[3]  (*Id.* ¶¶ 5-6.)  Darling accordingly created an electronic script, repricing that specific bundle of loans for the following two years.  (*Id.* ¶ 6.)

In the fall of 2020, a new analyst with Darling was assigned to Bangor Savings' ALM model, and in May 2021, the analyst inquired about the repricing dates on some of Bangor Savings' variable-rate commercial loans.  (*Id.* ¶ 7.)  Bangor Savings instructed the analyst to continue using the previously created script to apply, as before, to the specific bundle of commercial adjustable-rate loans that were subject to back-to-back interest rate swaps to account for their monthly repricing nature.  (*Id.*)  Darling never stated or implied to Bangor Savings that it could not or would not limit the script only to the specific bundle of loans identified by Bangor Savings.  (*Id.*)  Nevertheless, Bangor Savings alleges that Darling inappropriately applied the script adjusting repricing dates to a significantly broader set of loans than the specific bundle identified by Bangor Savings, and did so without Bangor Savings' knowledge or approval, causing the ALM model to produce results reflecting that Bangor Savings' balance sheet was significantly less liability

---

[3] Bangor Savings describes "back-to-back interest rate swaps" as typically involving a bank: (1) "issuing an adjustable interest loan to a commercial customer," (2) "entering into an interest rate swap agreement with such customer effectively converting to a fixed-interest loan" and then (3) entering "into a second adjustable interest rate swap with a third-party dealer" resulting in the bank receiving a variable interest rate on the commercial loans, while the customer pays a fixed rate.  (Compl. ¶ 5.)  According to Bangor Savings, the "second swap with the dealer offsets the bank's exposure from the first swap with the borrower, thereby allowing the bank to manage its interest rate risk effectively."  (*Id.* ¶ 30.)

sensitive than it was.  (*Id.* ¶¶ 8, 35.)  Bangor Savings alleges that as a result, it was unable to take timely action to protect itself from rising interest rates, and its net income was nearly $15 million lower than it would have been if the ALM model had not been impacted by Darling's mismanagement of the script.  (*Id.* ¶¶ 8, 10.)

According to Darling, the dispute in this case is governed by a Master Services Agreement (MSA) that the parties executed in August 2020.  (Mot. to Compel ¶ 1.)  As to the MSA, the record reveals the following: In July 2020, Darling's managing director sent an email to the vice president of Bangor Savings under the subject "Credit Stress Test Proposal."  (Transmittal Email, ECF No. 9-2.)  The email stated that certain "executable documents to move forward with the Credit Stress Testing service" were attached, including (1) a "Master Services Agreement," which would function as the parties' "new confidentiality agreement moving forward"; (2) a "Credit Stress Test Proposal" outlining the scope of the service and the fee structure;[4] and (3) a "Credit Stress Test Fee Schedule," which was described as the executable contract for the service.  (*Id.*)  The managing director advised that Darling would "need the MSA and Fee Schedule signed and returned

---

[4] The Proposal was attached to a letter to the vice president of Bangor Savings outlining a proposed engagement for provision of Darling's annual "Credit Stress Testing subscription."  (Opp. to Mot. to Compel, Paradis. Dec. Ex. B, ECF No. 18-3.)  The letter provided, in pertinent part: "If you would like to proceed with this engagement, we will send you a Master Services Agreement and Fee Schedule for execution."  (*Id.*)  The Proposal provided: "The objective of this engagement is the ongoing management and insight into how the Bank's credit losses and capital position might be impacted by stressful and changing economic conditions."  (*Id.*)  The Proposal further provided: "Upon receipt of an executed Master Services Agreement (MSA) and Fee Schedule, we will promptly initiate the process to deliver the Credit Stress Test."  (*Id.*)

to begin the project" and that Darling looked "forward to working with [Bangor Savings']

team on this project!" (*Id.*)

On August 20, 2020, the parties executed a "Master Services Agreement" (MSA)

pursuant to which Bangor Savings engaged Darling "to provide 'services and/or software'

('SERVICES') which [were] described on the attached Statement(s) of Work ('SOW(s)')

and/or Fee Schedule(s)." (MSA at 1, ECF No. 9-1.) Attached to the MSA was a Fee

Schedule titled "Darling Consulting Group Products Fee Schedule to Master Services

Agreement" that provided, in pertinent part: "This DCG Fee Schedule is entered into

between Darling Consulting Group ('DCG') and Bangor Savings Bank (the 'CLIENT').

This Fee Schedule and the DCG Master Services Agreement constitute the agreement

between the parties (the 'Agreement')." (Fee Schedule, ECF No. 18-2.) The Fee Schedule

described the service to be provided as the DCG Credit Stress Test and the term of the

Agreement as "one year commencing on the date" the Fee Schedule was executed—i.e.,

August 20, 2020—subject to renewal on a yearly basis thereafter. (*Id.*)[5]

The MSA specified that it was to be "governed by and construed in accordance

with" Massachusetts law and memorialized the parties' agreement to "submit to the

jurisdiction and venue of the state and federal courts" of Massachusetts "for any suit

relating to or arising from the SERVICES, subject to the following arbitration provision:

> Arbitration.  If there is a dispute regarding the SERVICES, SOW(s), Fee
> Schedule(s), or this Master Services Agreement, the parties agree to discuss

---

[5] Bangor Savings has submitted an affidavit from the representative who signed the MSA and the Fee Schedule on Bangor Savings' behalf, attesting that she did not believe the MSA or the Fee Schedule attached thereto to be related to the engagement letters governing the ALM services. (Paradis Dec. ¶ 24, ECF No. 18-1.)

resolution of the dispute in good faith.  Any dispute that cannot be resolved by the parties directly shall be timely submitted to the Boston, Massachusetts office of the American Arbitration Association ("AAA") for final and binding resolution, pursuant to the AAA Rules and Procedures for Arbitration of Commercial Disputes (single arbitrator).[6]

(MSA at 3.)

Darling has filed a demand for arbitration of this dispute with the AAA.  (Memo. of Law in Support of Mot. to Compel, Ex. 3, ECF No. 9-3.)

## LEGAL STANDARD

Congress adopted the Federal Arbitration Act (FAA) "in 1925 in response to a perception that courts were unduly hostile to arbitration." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018).[7]  By way of 9 U.S.C. § 2, Congress, perceiving the benefits of arbitration, "directed courts to abandon their hostility, *Epic Sys.*, 584 U.S. at 497, and instead treat "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract" as "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]"  9 U.S.C. § 2.  This provision, the Supreme Court has said, "establishes a 'liberal federal policy favoring arbitration agreements,'" *Epic Sys.*, 584 U.S. at 505-06

---

[6] Rule 7(a) of the rules, entitled jurisdiction, provides as follows:

> The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court.

American Arbitration Association, Commercial Arbitration Rules & Mediation Procedures (Sept. 1, 2022).

[7] The statute was later "reenacted and codified in 1947 as Title 9 of the United States Code." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 288 (2002).

(quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)), and reflects the "'fundamental principle that arbitration is a matter of contract,'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).

The FAA "also establishes procedures by which federal courts implement § 2's substantive rule." *Rent-A-Center*, 561 U.S. at 68.

> Under § 3, a party may apply to a federal court for a stay of the trial of an action "upon any issue referable to arbitration under an agreement in writing for such arbitration." Under § 4, a party "aggrieved" by the failure of another party "to arbitrate under a written agreement for arbitration" may petition a federal court "for an order directing that such arbitration proceed in the manner provided for in such agreement."

*Id.* (quoting 9 U.S.C. §§ 3-4). In other words, "[w]hen a party who has agreed to arbitrate a dispute instead brings a lawsuit, the Federal Arbitration Act . . . entitles the defendant to file an application to stay the litigation[,]" *Morgan v. Sundance, Inc.*, 596 U.S. 411, 413 (2022) (citing 9 U.S.C. § 3), and to compel arbitration, 9 U.S.C. § 4, as has happened here.

To prevail on a motion to compel arbitration, the movant must establish: (1) a valid arbitration agreement exists; (2) the movant is "'entitled to invoke the arbitration clause'"; (3) "'the other party is bound by that clause'"; and (4) the claim asserted falls within the scope of the arbitration clause. *Ne. Emergency Apparatus LLC v. Mine Respirator Co.*, No. 2:25-cv-00556-SDN, 2025 WL 3718367, at *3 (D. Me. Dec. 23, 2025) (quoting *Air-Con*, 21 F.4th at 174).[8]

---

[8] The First Circuit has advised that a "district court should evaluate a motion to compel arbitration against the summary judgment standard to determine whether a genuine dispute of fact exists regarding the parties' agreement to arbitrate[.]" *Air-Con*, 21 F.4th at 176; *see also Mills v. ALA Mgmt. Servs., Inc.*, No. CV-24-00441-PHX-SMB, 2024 WL 4972003, at *4 (D. Ariz. Dec. 4, 2024) ("Courts apply the standard governing

## DISCUSSION

"As always in arbitrability cases, there are disputes upon disputes, questions embedded within questions, and disputes about who should be answering those questions." *McKenzie v. Brannan*, 19 F.4th 8, 16 (1st Cir. 2021).  There are several types of disagreement in this case.  First, there is the *merits* dispute: i.e., whether Darling is liable to Bangor Savings for breach of contract or in tort.  Second, the parties disagree about whether they agreed to arbitrate the merits – a disagreement about *arbitrabilit*y.  "Third, they disagree about *who should have the primary power to decide the second matter*." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995).

There is also a fourth layer here: whether, in executing the MSA, the parties agreed that the arbitration provision within the MSA (and its incorporation of the Commercial AAA Rules delegating arbitrability issues to the arbitrator) would apply to or incorporate their prior agreement regarding the ALM services memorialized in the engagement letters.[9] Darling characterizes the MSA as an overarching agreement, intended to supply terms applicable to all of the parties' other agreements, including the engagement letters.  Bangor Savings sees the MSA differently – as a freestanding contract supplying terms for the Credit Stress Test Service, but not for the ALM services governed by the engagement

---

summary judgment for the resolution of a motion to compel arbitration because it is in effect a summary disposition of whether the parties had a meeting of the minds to agree to arbitrate.").

[9] In *Coinbase, Inc. v. Suski*, where the Supreme Court was presented with a similar question to the one presented in this case—when the litigants are parties to two contracts, one with an arbitration clause and one without, does the arbitration clause apply to both contracts—the Supreme Court identified this fourth layer of disputes as an issue a court must consider in certain cases.  602 U.S. 143, 149-50 (2024).  In this case, the Court follows the Supreme Court's guidance and the analysis in *Coinbase*.

letters.  If Darling is correct, the parties agreed to arbitrate the arbitrability of their dispute regarding the ALM services when they executed the MSA.  *See Bosse v. N.Y. Life Ins. Co.*, 992 F.3d 20, 29 (1st Cir. 2021) (reaffirming that "incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability issues to the arbitrator").  If Bangor Savings is correct, the MSA does not supersede or fill any gaps in the engagement letters with respect to dispute resolution, and the merits dispute regarding the ALM services is a matter to be decided by the courts.  *See First Options*, 514 U.S. at 942 ("[A] party who has not agreed to arbitrate will normally have a right to a court's decision about the merits of its dispute[.]").  "Thus, the question whether these parties agreed to arbitrate arbitrability can be answered only by determining which contract applies."  *Coinbase*, 602 U.S. at 150.

This fourth-order dispute presents a question for a court, not an arbitrator.  *Id.* at 145.  "[W]here, as here, parties have agreed to *two* contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs."  *Id.* at 152.  As the Supreme Court emphasized in *Coinbase*, to conclude otherwise would impermissibly exalt a delegation clause—a clause assigning threshold arbitrability issues to the arbitrator— above other forms of contract.  *Id.*[10]

---

[10] Darling's reliance on *Bosse v. New York Life Insurance Co.* is not persuasive, as the case is distinguishable in several respects. Like this case, *Bosse* involved multiple contracts – an employment agreement containing an arbitration clause and an incorporated delegation clause, and a separate agent agreement that did not contain an arbitration clause.  992 F.3d at 24-25.  In that case, the First Circuit concluded that the district court erred in not referring disputes as to the arbitrability of the claims to an arbitrator based on the text of the parties' agreement that clearly, unmistakably, and unambiguously delegated the arbitrability dispute to the arbitrator.  *Id.* at 28-29.  The express delegation clause in the employment agreement provided

9

The inquiry at this level of analysis is familiar: the question is whether the parties agreed to arbitrate their merits dispute. *Air-Con*, 21 F.4th at 174 ("The court's first step in determining whether to compel arbitration is to identify a valid and enforceable agreement to arbitrate between the parties."). This is the fundamental question in any arbitration dispute: "What have these parties agreed to?" *Coinbase*, 602 U.S. at 148. And, as always, the answer turns on traditional principles of contract law. *Id.* at 149.

"When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944. To the body of applicable state-law principles, the FAA adds "certain rules of fundamental importance, including the basic precept that arbitration 'is a matter of consent, not coercion[.]'" *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010) (quoting *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). The FAA "does not require parties to arbitrate when they have not agreed to do so[.]" *Volt*, 489 U.S. at 478. In evaluating whether and to what extent parties have agreed to arbitrate, "'as with any other contract, the parties' intentions control.'" *Stolt-Nielsen*, 559 U.S. at 682 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).

---

that the parties agreed "that any dispute, claim or controversy arising between them, including those alleging employment discrimination . . . in violation of a statute ['the Claim], as well as any dispute as to whether such Claim is arbitrable, shall be resolved by . . . arbitration." *Id.* at 29. In *Bosse*, the broad scope of the delegation clause could not be separated from the broad scope of the arbitration agreement. *Id.* at 30. By contrast, the arbitration agreement here is much more specific in describing the claims subject to arbitration, and the implied delegation clause here is similarly circumscribed.

Darling urges the Court to apply Massachusetts law, citing the MSA's governing law provision. Bangor Savings submits that the MSA's choice-of-law provision is irrelevant, as the MSA does not apply. Regardless of whether the Court applies the law of Maine (where this action is pending) or Massachusetts (as Darling urges), the result would be the same.

Under Maine law, "[a] contract exists if the parties mutually assent to be bound by all its material terms, the assent is either expressly or impliedly manifested in the contract, and the contract is sufficiently definite to enable the court to ascertain its exact meaning and fix exactly the legal liabilities of each party." *Sullivan v. Porter*, 861 A.2d 625, 631 (Me. 2004). In evaluating whether an agreement requires arbitration of specific claims pursuant to Maine contract law, the parties' written agreements are to be interpreted in accordance with the intention of the parties as "'ascertained from an examination of the instrument[s] as a whole. All parts and clauses must be considered together" to determine whether "and how far one clause is explained, modified, limited, or controlled by the others.'" *Combined Energies v. CCI, Inc.*, 514 F.3d 168, 171-72 (1st Cir. 2008) (quoting *Peerless Ins. Co. v. Brennon*, 564 A.2d 383, 385 (Me. 1989)).

Massachusetts law similarly provides that to create an enforceable contract, "there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 724 N.E.2d 699, 703 (Mass. 2000). "To ascertain intent, a court considers the words used by the parties, the agreement taken as a whole, and surrounding facts and

11

circumstances." *Mass. Mun. Wholesale Elec. Co. v. Town of Danvers*, 577 N.E.2d 283, 288 (Mass. 1991).

In support of its argument that the MSA requires arbitration of Bangor Savings' claims regarding the ALM services, Darling relies on the scope of the MSA's arbitration clause and the email by which Darling transmitted the MSA to Bangor Savings.

The email, under the subject line, "Credit Stress Test Proposal" read as follows:

Hi Sarah,

Attached are the executable documents to move forward with the Credit Stress Testing service, including:

1. Master Services Agreement: This will act as our new confidentiality agreement moving forward.
2. Credit Stress Test Proposal: Outlines the scope and fee structure.
3. Credit Stress Test Fee Schedule: Executable contract.

We will need the MSA and Fee Schedule signed and returned to begin the project.  Please confirm receipt and let me know if you have any questions.

Thanks and we look forward to working with your team on this project!

Joe Kennnerson
Managing Director

(Email, ECF No. 9-2.)  As for its scope, the MSA provided that Bangor Savings was "engaging" Darling "to provide 'services and/or software' (SERVICES') which are described on the attached Statement(s) of Work ('SOW(s)') and/or Fee Schedule(s)." (MSA at 1.)  The MSA further provided for arbitration of any "dispute regarding the SERVICES, SOW(s) Fee Schedule(s), or this Master Services Agreement." (*Id.* at 3.)  A single fee schedule—Darling Consulting Group Products Fee Schedule to Master Services Agreement—was attached to the MSA.  The MSA explicitly stated that the MSA "and the

12

attached/annexed SOW(s) and/or Fee Schedule(s) constitute the entire agreement between the parties[.]" (*Id.*) Like the MSA to which it was appended, the Fee Schedule was executed on August 20, 2020, and it provided in pertinent part: "This Fee Schedule and the DCG Master Services Agreement constitute the agreement between the parties (the 'Agreement')."

Darling characterizes the scope of the arbitration clause as "broad and comprehensive" and submits that it was "designed to capture all disputes arising from the parties' consulting relationship" including Bangor Savings' claims regarding the ALM services under the preexisting engagement letters. (Memo. of Law in Support of Mot. to Compel at 4, ECF No. 9.) Reading the pertinent provisions of the MSA together, along with the attached Fee Schedule, the Transmittal Email, and the July 2020 letter regarding the Credit Stress Testing proposal, leads to the opposite conclusion: the arbitration clause was limited to the SERVICES described in the Fee Schedule attached to the MSA, which pertained only to the provision of the Credit Stress Testing services.[11]

"Applying contract law principles, 'courts have consistently drawn a distinction between narrow arbitration clauses specifically identifying the issues to which they apply and broader forms of arbitration clauses.'" *Me. Sch. Admin. Dist. No. 68 v. Johnson*

---

[11] This conclusion is unaltered by sections 3, 4, and 7 of the MSA, which refer, respectively to "other subsequently annexed SOW(s) and/or Fee Schedule(s) signed by the parties for DCG to provide additional services," "other SOW(s) and/or Fee Schedule(s) signed by the parties for DCG to provide additional services" and "APPLICABLE SOW(S) AND/OR FEE SCHEDULES[.]" (MSA at 2.) None of this language can reasonably be interpreted to manifest an intent by the parties to annex or incorporate preexisting agreements for the ALM services that Darling was already providing at the time that the MSA was executed.

13

*Controls, Inc.*, 222 F. Supp. 2d 50, 55 (D. Me. 2002) (quoting *Fluehmann v. Assocs. Fin. Servs.*, No. CIV.A. 01-40076-NMG, 2002 WL 500564, at \*6 (D. Mass. Mar. 29, 2002)); *compare Next Step Med. Co. v. Johnson & Jonhson Int'l*, 619 F.3d 67, 72 (1st Cir. 2010) (discussing "broadly worded arbitration clause" whose subject matter covered "any dispute, controversy, or claim . . . arising out of or relating in any way to the business relationship" between certain parties); *with Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1, 9-10 (1st Cir. 2004) (examining arbitration clause in employment agreement that referred specifically to "disputes arising under or related to *that agreement*"). The arbitration clause in the MSA is of the narrow variety, as it specifically identified the issues to which it would apply. The MSA provided for Bangor Savings' engagement of Darling for certain defined SERVICES—those "described on the attached" Fee Schedule—and provided for arbitration of any dispute regarding those defined SERVICES as described on the attached Fee Schedule.

The Fee Schedule, providing for the Credit Stress Testing services, expressly memorializes the parties' unambiguous intent that the MSA and the Fee Schedule, together, constituted "the agreement" between the parties. *See Crowe v. Bolduc*, 334 F.3d 124, 137 (1st Cir. 2003) ("Under Maine law, . . . instruments executed at the same time, by the same contracting parties, for the same purposes, and in the course of the same transaction will be considered and construed together, since they are, in the eyes of the law, one contract or instrument.") (quotation marks omitted); *see also Bangor Hydro-Elec. Co. v. New England Tel. & Tel. Co.*, 62 F. Supp. 2d 152, 157 (D. Me. 1999) (explaining that, under

Maine law, ambiguity of contract language is a question of law that turns on whether the language is "*reasonably* susceptible of different interpretations").

Darling has identified no aspect of the MSA, the Fee Schedule attached thereto, or the email by which Darling transmitted the MSA and the Fee Schedule to Bangor Savings, that can reasonably be interpreted to mean that the parties intended to incorporate their other preexisting contractual agreements generally, or the engagement letters regarding the ALM services specifically, into the MSA. *See BBJ, Inc. v. MillerCoors, LLC*, No. 12-cv-11305-IT, 2015 WL 4465410, at *6 (D. Mass. July 21, 2015) (citing Massachusetts law and treatises for the proposition that for a document to be incorporated into a contract by reference, the document must be described in the contract so that the document may be ascertained beyond doubt). The MSA does not state that it applies to all aspects of the parties' consulting relationship, and it does not suggest, even by implication, that it was intended to supply terms applicable to the parties' preexisting engagement letters regarding the ALM services. If the parties had intended the MSA to accomplish these broad objectives, they could have expressly stated so.[12] *See Combined Energies*, 514 F.3d at 174 (rejecting contention that arbitration clause in one contract applied to a dispute arising out

---

[12] As Justice Gorsuch observed in his concurring opinion in *Coinbase*:

> Just imagine a master contract providing that "all disputes arising out of or related to this or future agreements between the parties, including questions concerning whether a dispute should be routed to arbitration, shall be decided by an arbitrator." Absent some later amendment, a provision like that would seem to require a court to step aside.

602 U.S. at 153 (Gorsuch, J., concurring).

of separate contract, even though contracts referenced each other); *Fit Tech*, 374 F.3d at 9-10 (same).

"Generally speaking, 'a party cannot be required to submit to arbitration any dispute which [it] has not agreed to so submit.'" *Next Step*, 619 F.3d at 71 (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). The claims set forth in Bangor Savings' complaint do not constitute a dispute regarding the MSA or the Credit Stress Testing services described in the Fee Schedule attached to the MSA. For that reason, the MSA, and its arbitration clause, do not govern this dispute.

### CONCLUSION

Following a review of the record and after consideration of the parties' arguments, the Court concludes that the agreement that is the subject of the parties' dispute in this matter did not include an arbitration provision. Accordingly, the Court denies Darling's motion to compel arbitration.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 4th day of June, 2026.

16